UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARMARTIA POULLARD,

    Plaintiff,

      v.

SMITHKLINE BEECHAM CORP.
T/A GLAXOSMITHKLINE,

    Defendant.

Civil Action No. 02-1590 (CKK)

**MEMORANDUM OPINION**
(November 30, 2005)

Plaintiff Larmartia Poullard filed this suit against her former employer, Defendant Smithkline Beecham Corporation, t/a GlaxoSmithKline ("GSK"), alleging, *inter alia*, intentional infliction of emotional distress (Count II), breach of contract (Count III), breach of good faith and fair dealing (Count IV), wrongful discharge (Count V), and defamation (Count VI) stemming from her belief that her termination was the result of impermissible gender-based discrimination. In addition to denying liability for the claims asserted by Plaintiff, GSK has filed a Counterclaim in this action, seeking $8,850.00 from Plaintiff for wrongful conversion of GSK funds during her time as a pharmaceutical consultant with the company.

Through a Memorandum Opinion and Order dated December 3, 2004, this Court dismissed for lack of subject matter jurisdiction Count I of Plaintiff's Complaint, in which Plaintiff alleged that her termination violated her rights against gender discrimination under the District of Columbia Human Rights Act, D.C. Code § 1-2501 *et seq.* Currently before the Court is Defendant's Motion for Summary Judgment as to the remaining counts in Plaintiff's lawsuit,

i.e., Counts II-VI, and as to Defendant's Counterclaim for unlawful conversion.  Upon a searching examination of Defendant's Motion, Plaintiff's Opposition, Defendant's Reply, the relevant case law, and the entire record herein, the Court shall grant in full Defendant's Motion for Summary Judgment.

## I: BACKGROUND

GSK is a research-based pharmaceutical and health care company that provides products ranging from vaccines to cancer medications to customers around the world.  Def.'s Stmt. of Mat. Facts ¶ 1; Pl.'s Response to Def.'s Stmt. ¶ 1.  As part of its marketing effort in the United States, GSK employs pharmaceutical consultants, or sales representatives, who provide clinical data and other information to physicians and promote the use of GSK products for approved purposes.  Def.'s Stmt. of Mat. Facts ¶ 2; Pl.'s Response to Def.'s Stmt. ¶ 2.  Each consultant is assigned a particular "territory," within which he or she travels daily, meeting with doctors and other health care professionals to discuss GSK products.  Def.'s Stmt. of Mat. Facts ¶ 3; Pl.'s Response to Def.'s Stmt. ¶ 3.  The normal business hours during which GSK expects sales representatives to be promoting GSK's products in physicians offices are 8:30 a.m. to 5:00 p.m. *See* Def.'s Mot. for Summ. J., Ex. 2 (Declaration of Brian Krebs (hereinafter, "Krebs Decl.")) ¶ 6; *id.*, Ex. 3 (Deposition of Brian Krebs (hereinafter, "Krebs Dep.")) at 92-93, 94, 158, 286-87, 304-06; *id.*, Ex. 4 (Deposition of Alexia Knight (hereinafter, "Knight Dep.")) at 58:4-13; *but see* Pl.'s Response to Def.'s Stmt. ¶ 24 (Plaintiff claims that she was never given a set schedule, and that the Employee Handbook makes it look like the fixed day was from 9:15 a.m. to 3:00 p.m., with "flex time" before and after) (citing Pl.'s Opp'n, Ex. 2 (Employee Handbook) at 1).

> A.        *Plaintiff Joins GSK as a Pharmaceutical Consultant*

On June 8, 2000, Plaintiff applied for a GSK sales position by filling out and signing a

four-page employment application.  Def.'s Stmt. of Mat. Facts ¶ 4; Pl.'s Response to Def.'s Stmt.

¶ 4.  On the final page of the application, in the paragraph immediately preceding her

certification that she had read and agreed to all of the stated terms, the following statement

appears:

> In consideration of my employment, I agree to conform to the rules and
> regulations of the Company and further agree that my employment and
> compensation can be terminated at any time, with or without cause or notice, at
> the option of either the Company or myself.

Def.'s Mot. for Summ. J., Ex. 22 (Pl.'s Employment Application) at 4.  Below this statement

appears Plaintiff's signed certification that she had "read and agree[d] to all terms as stated

above."  *Id.*; *see also* Def.'s Stmt. of Mat. Facts ¶¶ 12-15; Pl.'s Response to Def.'s Stmt. ¶¶ 12-

15.

Following her application, Plaintiff was interviewed by several GSK employees in the

ensuing weeks, including then-District Sales Manager Brian Krebs ("Krebs") and Regional Vice

President Sandra Weatherly ("Weatherly").  Def.'s Stmt. of Mat. Facts ¶ 5; Pl.'s Response to

Def.'s Stmt. ¶ 5.  In late June 2000, Krebs, in consultation with Weatherly, hired Plaintiff as a

GSK pharmaceutical consultant.  *See* Def.'s Mot. for Summ. J., Ex. 1 (Weatherly Decl.) ¶ 6; *id.*,

Ex. 2 (Krebs Decl.) ¶ 4; *see also* Def.'s Stmt. of Mat. Facts ¶ 19; Pl.'s Response to Def.'s Stmt. ¶

19.  A June 26, 2000 letter sent to Plaintiff confirmed her acceptance of employment.  *Id.*, Ex. 23

(Confirmation Letter).  This letter expressly stated:

> Please understand that neither this letter nor our offer of employment to you is
> intended to create or constitute an employment agreement or contract of any kind.

It is also not intended as a guarantee of employment.

*Id.* at 2; *see also* Def.'s Stmt. of Mat. Facts ¶ 16; Pl.'s Response to Def.'s Stmt. ¶ 16.

Upon Plaintiff's confirmed acceptance, she signed GSK's one-page "Conditions of

Employment on June 30, 2000.  *Id.*, Ex. 24 (Conditions of Employment).  Pursuant to this

document, Plaintiff agreed:

> That this document is not a contract guaranteeing employment for any specific
> duration.  The Company or I may terminate this relationship at any time, for any
> reason with or without cause or notice.  I understand that no supervisor, manager,
> or representative of SmithKline Beecham, other than the Chief Executive, has the
> authority to enter into any agreement with me for employment for any specified
> period or to make any promises or commitments which guarantee continued
> employment.  Any employment agreement entered into by the Chief Executive
> shall not be enforceable unless it is in writing and approved by the Chairman of
> the Board of SmithKline Beecham.

*Id.* at 1; *see also* Def.'s Stmt. of Mat. Facts ¶¶ 17-18; Pl.'s Response to Def.'s Stmt. ¶¶ 17-18

(Plaintiff did not enter into any employment agreement with the Chief Executive of GSK).

Around this same time, Plaintiff was provided with a copy of the company's Employee

Handbook, by which GSK provided her the following notice:

> *This Handbook is not a contract guaranteeing employment for any specific
> duration.  Either you or the company may terminate this relationship at any time,
> for any reason, with or without cause or notice.*

*Id.*, Ex. 12 (Suppl. Weatherly Decl.) ¶ 10 & attachment C (Employee Handbook) at 1 (emphasis

in original); *see also* Def.'s Stmt. of Mat. Facts ¶¶ 8-9; Pl.'s Response to Def.'s Stmt. ¶¶ 8-9.

Plaintiff read the one-page introduction to the Employee Handbook containing this notice when

she was hired.  Def.'s Stmt. of Mat. Facts ¶ 9; Pl.'s Response to Def.'s Stmt. ¶ 9.

These writings represent the sum of all materials provided to Plaintiff relating to the

terms and conditions of her employment with GSK.  There was never a written contract of

4

employment in place between Plaintiff and GSK.  Def.'s Stmt. of Mat. Facts ¶ 6; Pl.'s Response

to Def.'s Stmt. ¶ 6; Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 18:23-19:3 (Q: When you

were first employed by GSK, did you sign any employment contract?  A: No, I did not.  Q: After

you started working at GSK were you ever offered an employment contract?  A: No, I was not.").

Plaintiff was hired by GSK with no guarantee that she would remain employed for any specific

period of time.  Def.'s Stmt. of Mat. Facts ¶ 11; Pl.'s Response to Def.'s Stmt. ¶ 11.

     *B.*     *Plaintiff's Obligations as a Pharmaceutical Consultant at GSK*

     After her hiring at GSK, Plaintiff was assigned to a territory comprising Laurel, Bowie,

and Greenbelt, Maryland, and was placed on Krebs's sales team.  Def.'s Stmt. of Mat. Facts ¶ 20;

Pl.'s Response to Def.'s Stmt. ¶ 20 (claiming that the territory also included Lanham, Crofton,

Hyattsville, and Bladensburg, in Prince George's County, Maryland).  As a District Sales

Manager, Krebs oversaw ten to twelve GSK pharmaceutical consultants, who worked as a

"team" and were assigned to a southern Maryland territory.  Def.'s Stmt. of Mat. Facts ¶¶ 21-22;

Pl.'s Response to Def.'s Stmt. ¶¶ 21-22.[1]  From the summer of 2000 to the summer of 2001,

Plaintiff's job was to travel throughout the territory, meeting with physicians and distributing

---

[1] To certain paragraphs of Defendant's Statement of Material Facts Not in Dispute,
Plaintiff responds only that "the alleged facts asserted herein are neither relevant nor material to
any issue that has ever been in this litigation."  *See* Pl.'s Response to Def.'s Stmt. ¶¶ 21-22, 26,
29, 34, 36-41, 43-45, 56-57, 65-67.  Local Civil Rule 56.1 provides that "the court may assume
that facts identified by the moving party in its statement of material facts are admitted, unless
such a fact is controverted in the statement of genuine issues file[d] in opposition to the motion."
*See* LCvR 56.1.  Plaintiff's response is insufficient under the local rule, as Plaintiff has not
controverted or rebutted the paragraphs listed.  As such, the Court deems the cited paragraphs
admitted by Plaintiff.  Moreover, upon an analysis, it is clear that the information in question is
material and relevant to the claims involved in the case – whether in Plaintiff's Complaint or
Defendant's Counterclaim – and GSK has certainly introduced uncontested admissible evidence
supporting the statements listed in these paragraphs.

GSK product information and samples.  Def.'s Stmt. of Mat. Facts ¶ 23; Pl.'s Response to Def.'s

Stmt. ¶ 23.  During her tenure, Plaintiff understood that GSK expects its sales representatives to

be in the field visiting doctors' offices during their regular business hours.  Def.'s Stmt. of Mat.

Facts ¶ 25; Pl.'s Response to Def.'s Stmt. ¶ 25.  Plaintiff met with her supervisor, Krebs, several

times every other month to review business issues.  Def.'s Stmt. of Mat. Facts ¶ 26; Pl.'s

Response to Def.'s Stmt. ¶ 26.  Such meetings either took place at GSK's field office in

Greenbelt, Maryland, or took the form of "work contacts," in which Krebs joined Plaintiff for the

day as she canvassed her Maryland territory.  *Id.*

       In addition to her field duties as a salesperson, Plaintiff was expected to perform several

important administrative tasks.  *See* Def.'s Mot. for Summ. J., Ex. 3 (Krebs Dep.) at 238-39.  For

instance, as Krebs spelled out in his "Expectations for 2001" memo, Plaintiff was required to

input her physician call activity, or "call notes," daily into GSK's computer system through her

laptop provided by GSK.  Def.'s Stmt. of Mat. Facts ¶ 27; Pl.'s Response to Def.'s Stmt. ¶ 27

(Plaintiff claims that her understanding was that call activity was to be input anywhere from a

couple of times a week to a couple of times a month); *but see* Def.'s Mot. for Summ. J., Ex. 6

(Krebs's "Expectations for 2001" presented to Plaintiff on January 3, 2001); *id.*, Ex. 5 (Poullard

Dep.) at 54:7-8 (Plaintiff recalls having seen the "Expectations for 2001").  As Krebs noted in his

"Expectations for 2001," call reporting was to be "[d]one on a daily basis and should be after

each call."  *Id.*  "This is company policy," he added, "and I feel very strongly about this!."  *Id.*;

*see also* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 31-32 (Plaintiff recalls that at another

meeting, Krebs stressed that he wanted call reporting at least three times a week); Def.'s Stmt. of

Mat. Facts ¶¶ 28-30; Pl.'s Response to Def.'s Stmt. ¶¶ 28-30 .  In addition to the "call notes,"

Plaintiff was also required to submit expense reports to Krebs promptly after each expense

period; in particular, the reports were to be submitted to Krebs by the Wednesday following each

expense period, with no exceptions permitted.  Def.'s Mot. for Summ. J., Ex. 3 (Krebs Dep.) at

62:8-9.  While expense reports were to be submitted electronically, the supporting receipts were

to be mailed contemporaneously to GSK in order to substantiate the expenses incurred by the

pharmaceutical consultant.  Def.'s Stmt. of Mat. Facts ¶ 62; Pl.'s Response to Def.'s Stmt. ¶ 62.

    *C.*       *Problems Arise With Plaintiff's Compliance*

Over the course of Plaintiff's tenure at GSK, Krebs developed serious concerns regarding

Plaintiff's compliance with GSK's administrative requirements, leading to "ongoing discussions"

about what Krebs saw as Plaintiff's "lack of administrative efforts."  Def.'s Stmt. of Mat. Facts ¶

31; Pl.'s Response to Def.'s Stmt. ¶ 31.[2]  Krebs's first area of concern centered on a lack of

timely call reporting by Plaintiff.  On February 28, 2001, Plaintiff acknowledged in an email

message to Krebs that he had contacted her to express his concerns about her call notes.  Def.'s

Stmt. of Mat. Facts ¶ 32; Pl.'s Response to Def.'s Stmt. ¶ 32.  Plaintiff admitted that she "ha[d]

been less than timely in updating [her] call activity," and she promised "to make a conscious

effort to input [her] calls during the day, as we discussed."  *Id.*  In June and July 2001, Plaintiff

fell significantly behind in her call reporting, waiting until "July 19, 2001 at 4:00am" to "input

---

[2] Plaintiff claims that she refutes this "allegation" on page 30 of her deposition.  *See* Pl.'s Response to Def.'s Stmt. ¶ 31.  A reading of this page undermines Plaintiff's claim:  during this portion of her testimony, Plaintiff simply reviews company procedure, and notes that calls were to be recorded on the laptop computer provided by the company.  *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 30.  Nowhere does Plaintiff contest that she and Krebs had discussions concerning her administrative obligations.  Plaintiff's dispute as to this point seems even more specious given her admission that she and Krebs had discussed her "less than timely updating" of her call activity in a February 28, 2001 email to Krebs.  *See* Def.'s Stmt. of Mat. Facts ¶ 32; Pl.'s Response to Def.'s Stmt. ¶ 32.

[her] unreported call activity for the month[s] of June and July."  Def.'s Stmt. of Mat. Facts ¶ 35;

Pl.'s Response to Def.'s Stmt. ¶ 35; *see also* Def.'s Mot. for Summ. J., Ex. 10 (Grievance Letter)

at 3.

Krebs also became concerned about lapses in Plaintiff's expense reporting by the spring

of 2001.  Specifically, in a March 16, 2001 letter to Plaintiff, Krebs raised expense reporting

problems and noted that he had "spoken to [Plaintiff] about this in the past and we are clear with

expectations involving this subject."  Def.'s Stmt. of Mat. Facts ¶ 39; Pl.'s Response to Def.'s

Stmt. ¶ 39; Def.'s Mot. for Summ. J., Ex. 11 (Mar. 16, 2001 letter from Krebs to Plaintiff).

Plaintiff acknowledged in a March 26, 2001 letter that Krebs had alerted her both by letter and in

conversations of problems with her expense reporting.  Def.'s Stmt. of Mat. Facts ¶ 40; Pl.'s

Response to Def.'s Stmt. ¶ 40; Def.'s Mot. for Summ. J., Ex. 8 (Mar. 26, 2001 letter from

Poullard to Krebs).

Upon a more searching scrutiny of Plaintiff's activities, Krebs found that, according to

Plaintiff's call notes, Plaintiff had on multiple workdays recorded few or no calls to physicians'

offices, Def.'s Stmt. of Mat. Facts ¶ 41; Pl.'s Response to Def.'s Stmt. ¶ 41, and that, according

to Plaintiff's gas purchase records, Plaintiff had on numerous occasions left her assigned territory

during normal business hours, Def.'s Stmt. of Mat. Facts ¶ 42; Pl.'s Response to Def.'s Stmt. ¶

42.  Importantly, the GSK manual for sales representatives makes clear that failure to work a full

day during normal business hours is regarded as a sufficiently serious violation of the company

policy that immediate discharge may be imposed as a disciplinary action.  Def.'s Stmt. of Mat.

Facts ¶ 43; Pl.'s Response to Def.'s Stmt. ¶ 43.

D.      *The Decision to Terminate Plaintiff's Employment With GSK*

After consultation with Sandra Weatherly, and with Weatherly's approval, Krebs ultimately recommended that GSK terminate Plaintiff's employment. Def.'s Stmt. of Mat. Facts ¶ 45; Pl.'s Response to Def.'s Stmt. ¶ 45. On August 9, 2001, Plaintiff's employment was terminated for "[v]iolation of company regulations," including "[i]naccurate call reporting" and being "out of territory numerous times during business hours without notifying manager." Def.'s Stmt. of Mat. Facts ¶¶ 46-47; Pl.'s Response to Def.'s Stmt. ¶¶ 46-47. The GSK manual for sales representatives also makes clear that inaccurate call reporting is regarded as a sufficiently serious violation of company policy that immediate discharge may be imposed as a disciplinary action. Def.'s Stmt. of Mat. Facts ¶ 44; Pl.'s Response to Def.'s Stmt. ¶ 44.

As Plaintiff herself recounted in an August 12, 2001 letter entitled "Formal Grievances of Wrongful Termination of Employment with GSK," Krebs and another GSK employee present at the August 9, 2001 termination meeting brought to her attention numerous instances of low or no call activity, as well as discrepancies between her call reports and email communications to her immediate supervisor, Brian Krebs. Def.'s Stmt. of Mat. Facts ¶ 48; Pl.'s Response to Def.'s Stmt. ¶ 48. Specifically, Krebs (1) showed Plaintiff a record of receipts indicating that she had purchased gas out of her territory during work hours, Def.'s Stmt. of Mat. Facts ¶ 49; Pl.'s Response to Def.'s Stmt. ¶ 49; and (2) questioned Plaintiff about numerous instances where her Weekly Activity Report ("WAR") showed little or no call activity during the period from mid-April to mid-July, 2001, Def.'s Stmt. of Mat. Facts ¶ 50; Pl.'s Response to Def.'s Stmt. ¶ 50. In doing so, Krebs questioned Plaintiff about her activities on April 16-20, April 23, April 24, May 7, May 9, May 11, May 18, May 21-25, and May 28. Def.'s Stmt. of Mat. Facts ¶ 51; Pl.'s

9

Response to Def.'s Stmt. ¶ 51.  Krebs further pointed out discrepancies where Plaintiff had informed management that she was out of the area on vacation, but then reported that she was engaging in sales activity or taking clients to lunch – e.g., June 5, June 25, and July 5, 2001. Def.'s Stmt. of Mat. Facts ¶ 52; Pl.'s Response to Def.'s Stmt. ¶ 52.  Despite being provided the opportunity to fully respond, Plaintiff elected to respond only with respect to two of the various dates about which GSK had concerns:  June 18 and June 25, 2001.  Def.'s Stmt. of Mat. Facts ¶¶ 48, 53; Pl.'s Response to Def.'s Stmt. ¶¶ 48, 53.  Moreover, Plaintiff offered no response of any kind at the meeting regarding the record of receipts showing that she had purchased gas out of her territory during work hours.  Def.'s Stmt. of Mat. Facts ¶ 49; Pl.'s Response to Def.'s Stmt. ¶ 49.

On August 12, 2001, Plaintiff filed a detailed "Formal Grievance" document with GSK wherein she proffered explanations of three or four of the many questioned dates, in addition to June 18 and 25, 2001.  Def.'s Stmt. of Mat. Facts ¶ 54; Pl.'s Response to Def.'s Stmt. ¶ 54.  On August 23, 2001, GSK responded to Plaintiff's "Grievance Letter" with a letter informing Plaintiff that a grievance committee would be formed to investigate the claims outlined in her letter, and providing her with a list of trained panel members among whom to select.  Def.'s Stmt. of Mat. Facts ¶ 55; Pl.'s Response to Def.'s Stmt. ¶ 55.  Plaintiff subsequently retained counsel, and on September 27, 2001, GSK contacted Plaintiff's counsel and advised him that the company was still waiting to hear from Plaintiff so that they might continue the grievance process.  Def.'s Stmt. of Mat. Facts ¶ 56; Pl.'s Response to Def.'s Stmt. ¶ 56.  While Plaintiff's counsel received GSK's September 27, 2001 letter, GSK never received any response from either Plaintiff or her counsel.  *Id.*

E.      *The Aftermath*

1.      <u>Expense-Reimbursement Issues Arise</u>

In the weeks following Plaintiff's August 9, 2001 termination, GSK discovered after the

fact that Plaintiff had not followed the required procedures for GSK's expense-reimbursement

system; this discovery came too late to play any role in Plaintiff's termination.  Def.'s Stmt. of

Mat. Facts ¶ 70; Pl.'s Response to Def.'s Stmt. ¶ 70 (Plaintiff notes that the earliest she found out

about the expense issues was in September 2001).

GSK's pharmaceutical consultants or sales representatives regularly incur reimbursable

expenses in the performance of their duties.  Def.'s Stmt. of Mat. Facts ¶ 58; Pl.'s Response to

Def.'s Stmt. ¶ 58.  For example, such expenses may include, but are not limited to, the purchase

of office supplies.  *Id.*  Throughout the period during which Plaintiff was employed by GSK,

sales representatives were expected to cover such expenses by advancing themselves cash, as

needed, through a system of "drafts."  Def.'s Stmt. of Mat. Facts ¶ 59; Pl.'s Response to Def.'s

Stmt. ¶ 59.  Under the drafts system, GSK issued each sales representative books of drafts

payable through Mellon Bank in Pittsburgh, Pennsylvania.  Def.'s Stmt. of Mat. Facts ¶ 60; Pl.'s

Response to Def.'s Stmt. ¶ 60.  Each book contained twenty drafts, and each draft could be

cashed for any amount up to five hundred dollars.  *Id.*  GSK pre-printed on the drafts the name of

the particular employee to whom they were issued, thereby rendering them payable only to the

recipient employee.  *Id.*  Each draft also bore the employee's identification number and territory

number, as well as a draft number.  *Id.*  When an employee incurred or anticipated incurring

expenses, she would fill in both a sum and the date, sign the draft on the front and endorse it on

the back, and then simply cash it like a check.  Def.'s Stmt. of Mat. Facts ¶ 61; Pl.'s Response to

11

Def.'s Stmt. ¶ 61.

The employee was then expected to account for each cashed draft on regular expense reports, and to submit receipts substantiating the claimed expenses. *Id.* Expense reports were submitted electronically and supporting receipts were mailed to GSK. Def.'s Stmt. of Mat. Facts ¶ 62; Pl.'s Response to Def.'s Stmt. ¶ 62. As the then-applicable Sales Force "Answers" manual explained, drafts were to be used "only for business expenses." Def.'s Stmt. of Mat. Facts ¶ 63; Pl.'s Response to Def.'s Stmt. ¶ 63. Using drafts for personal expenses was "a serious violation of company regulations and c[ould] lead to termination." *Id.* While employees were to cash drafts as needed, they were advised that "[a]n entire book of drafts should not be cashed at once." *Id.*

Plaintiff employed the drafts system to cover certain of her business expenses while she was employed at GSK. Def.'s Stmt. of Mat. Facts ¶ 64; Pl.'s Response to Def.'s Stmt. ¶ 64. On May 31, 2001, just days before leaving on her June 4-11, 2001 vacation, Plaintiff cashed eighteen (18) drafts worth a total of $8,850. Def.'s Stmt. of Mat. Facts ¶ 65; Pl.'s Response to Def.'s Stmt. ¶ 65. These drafts were numbered 255545, 255546, 255547, 255548, 255549, 255550, 2555551, 255552, 255553, 255554, 255555, 255556, 255557, 255558, 255559, 255560, 255561, and 255562. *Id.*; *see also* Def.'s Mot. for Summ. J., Ex. 16 (Edwards Decl.) at ¶¶ 11-13 & Attach. A, B (copies of the cashed drafts). On June 18, 2001, Plaintiff cashed another two drafts, numbered 255563 and 255564, together worth $1,000. Def.'s Stmt. of Mat. Facts ¶ 66; Pl.'s Response to Def.'s Stmt. ¶ 66; *see also* Def.'s Mot. for Summ. J., Ex. 16 (Edwards Decl.) at ¶¶ 11-20 & Attach. A-C (copies of the cashed drafts and expense report records).

Of the $9,850 that Plaintiff withdrew on May 31 and June 18, 2001, Plaintiff later accounted for only the $1,000 withdrawn on drafts 255545 and 255546.  Def.'s Stmt. of Mat. Facts ¶ 67 (noting that Plaintiff accounted for this total on her July 2-13 and July 16-27 expense reports); Pl.'s Response to Def.'s Stmt. ¶ 67.  Plaintiff never submitted documentation to prove that the remaining $8,850 was expended for company business.  Def.'s Stmt. of Mat. Facts ¶ 68; Pl.'s Response to Def.'s Stmt. ¶ 68.  Plaintiff never acknowledged on her expense reports that she had cashed the eighteen (18) drafts in question – i.e., draft numbers 255547 through 255564.  Def.'s Stmt. of Mat. Facts ¶ 69; Pl.'s Response to Def.'s Stmt. ¶ 69.  Through an October 28, 2002 facsimile to her counsel, GSK made a demand to Plaintiff for the return of previous "draft" advances amounting to $8,850.  Def.'s Stmt. of Mat. Facts ¶ 71; Pl.'s Response to Def.'s Stmt. ¶ 71.  Given Plaintiff's failure to respond to GSK's October 28, 2002 demand letter, Def.'s Stmt. of Mat. Facts ¶ 72; Pl.'s Response to Def.'s Stmt. ¶ 72, GSK brought a Counterclaim against Plaintiff, asserting that she wrongfully converted GSK funds by cashing company checks and neither repaying the funds nor accounting for them as business expenses.  *See* Def.'s Answer to Compl. and Counterclaim at 7-8, ¶¶ 1-15.

### 2. Plaintiff is Hired as a Senior Sales Professional by Sanofi-Synthelabo

On August 29, 2001, less than three weeks after her termination by GSK, Plaintiff was offered a position as a Senior Sales Professional at the pharmaceutical company Sanofi-Synthelabo Inc. ("Sanofi").  Def.'s Stmt. of Mat. Facts ¶ 73; Pl.'s Response to Def.'s Stmt. ¶ 73.  On September 4, 2001, Plaintiff began work at Sanofi, where she has operated as a "top performer."  Def.'s Stmt. of Mat. Facts ¶ 74; Pl.'s Response to Def.'s Stmt. ¶ 74.  Sanofi gave Plaintiff a starting base salary of $55,000 per year – approximately $1,700 more than her ending

base salary at GSK – and, in 2002, Plaintiff earned from Sanofi an additional sales bonus of

$17,496.85.  Def.'s Stmt. of Mat. Facts ¶ 75; Pl.'s Response to Def.'s Stmt. ¶ 75.  In September

2003, Sanofi promoted Plaintiff to the position of "Specialty Sales Professional," and by October

2004, Plaintiff's base salary had increased to $68,200 per annum.  Def.'s Stmt. of Mat. Facts ¶

76; Pl.'s Response to Def.'s Stmt. ¶ 76.  In December 2003, Sanofi offered – but Plaintiff

declined – a further promotion by which Plaintiff would have become a training manager in New

York.  Def.'s Stmt. of Mat. Facts ¶ 77; Pl.'s Response to Def.'s Stmt. ¶ 77.  This promotion

would have provided her with a salary increase of somewhere between $10,000 and $12,000 per

year.  *Id.*

### 3.   Plaintiff Brings a Civil Complaint in this Action

On August 9, 2002, Plaintiff filed a Complaint before this Court, alleging (1) wrongful

termination by GSK based upon her gender in contravention of the D.C. Human Rights Act; (2)

intentional infliction of emotional distress; (3) breach of contract; (4) breach of good faith and

fair dealing; and (5) wrongful discharge.  *See* Compl., Counts I-V.  In addition, Plaintiff's

Complaint alleges that GSK defamed her by making false statements to Plaintiff's former clients

and colleagues regarding the reasons for her termination.  *See id.*, Count VI.  Plaintiff's

Complaint asks that this Court award her actual damages relating to lost salary and benefits;

foreseeable damages from GSK; compensatory damages in the amount of $1,000,000 for damage

to her professional reputation; punitive damages in the amount of $2,500,000 for GSK's alleged

deliberate, willful, and wanton disregard for her rights, and for its intentional infliction of

emotional distress and defamation; and costs and attorney's fees as may be allowed by law.  *Id.* at

7 (Prayer for Relief).

14

4.      Plaintiff Claims that She Was Defamed by GSK

As set forth in Count VI of her Complaint, subsequent to her termination by GSK, Plaintiff contends that GSK "advised former clients and colleagues of the plaintiff that she had been terminated because she embezzled $8,000.00 from GSK," even though GSK at the time "knew that [such statements] were false and slanderous."  Compl. ¶¶ 32-33.  Plaintiff asserts that GSK "made defamatory statements to further cloak its discriminatory conduct by subjecting plaintiff to disgrace . . . and to elevate the defendant's own reputation and credibility."  *Id.* ¶ 34. Plaintiff believes that Weatherly and Krebs are the two GSK management officials who informed her former GSK clients and colleagues that Plaintiff had embezzled GSK funds.  Def.'s Stmt. of Mat. Facts ¶ 81; Pl.'s Response to Def.'s Stmt. ¶ 81.

In a response to an Interrogatory from GSK, Plaintiff listed Alexia Knight, Dr. Richard Ashby, and Michael McGhee as "all persons who have any knowledge" concerning the allegation that GSK circulated to Plaintiff's former client and colleagues that she had been terminated for "embezzling" from GSK, "including . . . the particular former clients and colleagues who allegedly received such information."  *See* Def.'s First Set of Interrog. to Pl.  In her deposition testimony, Plaintiff added Dr. David Gooray as a fourth recipient of the defamatory statements from Krebs and Weatherly.  *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 144:11-18, 145:8-17, 146:19-25.

During the deposition process in this case, Weatherly and Krebs both categorically denied that they ever informed Plaintiff's former clients or colleagues of the company's belief that Plaintiff had wrongfully converted GSK funds or engaged in any financial impropriety.  Def.'s Stmt. of Mat. Facts ¶ 82; Pl.'s Response to Def.'s Stmt. ¶ 82.  Dr. Richard Ashby and Dr. David

15

Gooray signed declarations indicating that they were not informed by any GSK manager or employee – including Weatherly and Krebs – of the specific reasons for Plaintiff's departure from GSK; Drs. Ashby and Gooray also indicated that neither of them was ever informed by any GSK manager or employee – including Weatherly and Krebs – that Plaintiff, while she was employed by GSK, engaged in any financial impropriety. Def.'s Stmt. of Mat. Facts ¶ 84; *but see* Pl.'s Response to Def.'s Stmt. ¶ 84 (Plaintiff claims that Dr. Ashby admitted to her that Weatherly called him and informed him that Plaintiff was terminated because she stole $8,000 from the company); Pl.'s Response to Def.'s Stmt., Ex. 4 (Weatherly Dep.) at 66 (Weatherly admits speaking with Dr. Ashby and discussing Plaintiff's termination, but denies informing Dr. Ashby that her termination resulted from financial improprieties). During her testimony, Ms. Knight stated that she never received from Weatherly or Krebs any information indicating that Plaintiff had been terminated for stealing money from GSK. Def.'s Stmt. of Mat. Facts ¶ 83. However, Knight admitted that she heard a rumor that Plaintiff had stolen money from GSK from a therapeutic specialist by the name of Nicole Cavanaugh. Pl.'s Response to Def.'s Stmt. ¶ 83. In contrast, Ms. Cavanaugh has signed a declaration stating that (1) no GSK manager, including Weatherly and Krebs, ever informed her of the reasons for Plaintiff's departure from GSK, and (2) no GSK manager, including Weatherly and Krebs, ever informed her that Plaintiff had engaged in any financial impropriety. *See* Def.'s Mot. for Summ. J., Ex. 30 (Cavanaugh Decl.) ¶¶ 3-4. During discovery, GSK was unable to locate Michael McGhee, and neither party deposed Mr. McGhee or offered any evidence as to any information that he may have received from Weatherly or Krebs. *See* Def.'s Mot. for Summ. J. at 37 & n.84.

5.       Plaintiff Receives Psychological Counseling

In her Complaint, Plaintiff claimed that GSK's decision to terminate her caused her significant emotional distress.  *See* Compl. (Count II) ¶ 20 ("She has also been caused great distress, humiliation, and mental anguish."), (Count V) ¶ 30 (same).  In an effort to substantiate these claims, Plaintiff noted during her deposition that her termination caused her "mental anguish and distress to the point that [she] sought counseling about it" and "still see[s] counseling about it."  *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 163:2-4.  During discovery, it was revealed that Plaintiff did not seek professional counseling until November 19, 2003.  Def.'s Stmt. of Mat. Facts ¶ 78; Pl.'s Response to Def.'s Stmt. ¶ 78.  The notes of Plaintiff's counselor, Saundra Walker-Harris, reveal that Plaintiff sought counseling to address concerns relating to her relationship with her boyfriend and issues with her current employer, Sanofi.  Def.'s Stmt. of Mat. Facts ¶ 79; Pl.'s Response to Def.'s Stmt. ¶ 79.  Ms. Walker-Harris's counseling notes do not indicate that the counseling sessions addressed Plaintiff's termination from GSK.  Def.'s Stmt. of Mat. Facts ¶ 80; Pl.'s Response to Def.'s Stmt. ¶ 80.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant

to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587,

106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

Defendant's lengthy Motion for Summary Judgment contends that summary judgment is

appropriate in favor of GSK on all remaining counts alleged in Plaintiff's Complaint (Counts II-

VI), as well on Defendant's Counterclaim for unlawful conversion of GSK funds. *See generally*

Def.'s Mot. for Summ. J.  Specifically, as to Count III of Plaintiff's Complaint (breach of

contract), Defendant argues that Plaintiff cannot establish a *prima facie* case for breach of

contract, given her clear status as an "at-will" employee who could be terminated at any time by

GSK. *See id.* at 15-24.  Moreover, even assuming *arguendo* that a contract for term could be

implied between the parties, GSK emphasizes that it had ample cause for Plaintiff's termination

due to her failure to timely report her calls and her travels outside of her sales territory during

normal business hours. *Id.* at 24-28.  As to Count V of Plaintiff's Complaint (wrongful

discharge), GSK points out that the District of Columbia does not generally recognize a tort

action for wrongful discharge of an "at-will" employee, *id.* at 28 (citing *Downey v. Firestone Tire*

*& Rubber Co.*, 630 F. Supp. 676, 681 (D.D.C. 1986) (applying D.C. law)), and Plaintiff has

adduced no evidence that would allow her to proceed under the narrow exception recognized in

*Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C. 1991) ("a very narrow exception to

the at-will doctrine under which a discharged at-will employee may sue his or her former

employer for wrongful discharge is when the sole reason for the discharge is the employee's

refusal to violate the law, as expressed in a statute or municipal regulation").

Further, GSK asserts that it is entitled to summary judgment as to Count IV of Plaintiff's Complaint (breach of duty of good faith and fair dealing), as it rests upon an implied covenant not recognized for "at-will" employees within the District of Columbia.  Def.'s Mot. for Summ. J. at 30-31 (citing *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 625-27 (D.C. 1997)).  Finally, GSK contends that Count II of Plaintiff's Complaint (intentional infliction of emotional distress), must fail as a matter of law because "[e]ven were every one of [Plaintiff's] allegations true, the conduct that [Plaintiff] attributes to GSK would not be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Id.* at 32-33 (citing *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)).

Despite the extensive arguments and evidence proffered by GSK relating to Counts II-V of Plaintiff's Amended Complaint, Plaintiff's Opposition offers absolutely no response to these contentions.  Rather, Plaintiff's Opposition begins by stressing, "As will be shown below, however, there are material facts in dispute as to Count VI of plaintiff's complaint and most certainly as to the counterclaim of the defendant."  Pl.'s Opp'n at 1.  Plaintiff concludes her Opposition by stating that she "respectfully submits that defendant's motion must be denied as to Defendant's Counterclaim and Count VI of plaintiff's complaint, defamation." *Id.* at 7.  Given the plain limiting language in Plaintiff's Opposition and her failure to offer any argument with regard to Counts II through V of her Complaint, the Court finds that Plaintiff has effectively conceded these claims, and awards summary judgment in favor of GSK as to Counts II-V of Plaintiff's Complaint.

Plaintiff's explicit and implicit concession of certain claims leaves only two issues

currently before this Court for potential resolution on GSK's Motion for Summary Judgment:

(1) Defendant's Counterclaim, which asserts that Plaintiff unlawfully converted GSK funds by

"cash[ing] at least $8,850 of GlaxoSmithKline's funds without submitting adequate proof that

the funds were expended for company business," Def.'s Answer to Compl. and Counterclaim at

8, ¶ 9; (2) Count VI of Plaintiff's Complaint, which alleges that GSK defamed Plaintiff by

"advis[ing] former clients and colleagues of the plaintiff that she had been terminated because

she had embezzled $8,000.00 from GSK," Compl. ¶ 32.  The Court shall conduct a searching

review of each remaining claim in turn.

       A.     *Defendant's Counterclaim for Unlawful Conversion*

For its Counterclaim, GSK has alleged that Plaintiff cashed $8,850 in GSK funds in May

and June 2001 without submitting any proof or documentation that the sum was expended for

company business.  Def.'s Answer to Compl. and Counterclaim at 7-8, ¶¶ 1-15.  According to

GSK, "[b]ecause it is indisputable that [Plaintiff] cashed drafts worth $8,850, and that she never

accounted for those funds as business expenses nor repaid them, summary judgment is

appropriate in favor of GSK."  Def.'s Mot. for Summ. J. at 12.

Pursuant to District of Columbia law, a party will be liable for conversion if the movant

establishes that the individual participated in "(1) an unlawful exercise, (2) of ownership,

dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of

that person's rights thereto."  *Gov't of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45,

62 (D.D.C. 2002) (citing cases); *see also Kaempe v. Myers*, 367 F.3d 958, 964 (D.C. Cir. 2004)

(citing *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956)); *Flocco v. State Farm Mut. Auto. Ins.*

*Co.*, 752 A.2d 147, 158 (D.C. 2000). The burden of proof for a conversion claim is a preponderance of the evidence. *R.A. Weaver & Assoc., Inc. v. Haas & Haynie Corp.*, 663 F.2d 168, 172-74 (D.C. Cir. 1980); *Landise v. Mauro*, 725 A.2d 445, 450 (D.C. 1998). When the initial possession is lawful, the movant must make a demand for the return of the coverted goods to demonstrate the adverse nature of the possession. *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001) (citing *Shea*, 123 A.2d at 361). "Money can be the subject of a conversion claim when the plaintiff has the right to a specific identifiable fund of money." *Gov't of Rwanda*, 227 F. Supp. 2d at 62-63 (citing *Curaflex Health Serv. v. Bruni*, 877 F. Supp. 30, 32 (D.D.C. 1995)).

In this case, Plaintiff employed GSK's draft system to cash eighteen (18) drafts worth a total of $8,850 on May 31, 2001, and another two (2) drafts worth a total of $1,000 on June 18, 2001. Def.'s Stmt. of Mat. Facts ¶¶ 65-66; Pl.'s Response to Def.'s Stmt. ¶¶ 65-66. However, of the $9,850 that Plaintiff withdrew on May 31 and June 18, 2001, Plaintiff later accounted only for the $1,000 withdrawn on drafts 255545 and 255546 in her July 2-13 and July 16-27 expense reports. Def.'s Stmt. of Mat. Facts ¶ 67; Pl.'s Response to Def.'s Stmt. ¶ 67. Plaintiff never submitted documentation to prove that the remaining $8,850 was expended for company business, Def.'s Stmt. of Mat. Facts ¶ 68; Pl.'s Response to Def.'s Stmt. ¶ 68, and never acknowledged on any of her expense reports that she had cashed the eighteen (18) remaining drafts in question – draft numbers 255547 through 255564, Def.'s Stmt. of Mat. Facts ¶ 69; Pl.'s Response to Def.'s Stmt. ¶ 69. Accordingly, GSK was faced with a situation where Plaintiff did not submit expense reports detailing how the $8,850 was spent, or any supporting receipts, despite having over three months to do so and having already submitted expense reports which

covered the relevant time period.  Indeed, Plaintiff did not offer any explanation as to how the money was spent, and did not direct GSK to any third parties from whom more information could be obtained.  *See* Def.'s Stmt. of Mat. Facts ¶¶ 67-69; Pl.'s Response to Def.'s Stmt. ¶¶ 67-69.  As such, GSK relayed these failures to Plaintiff's counsel in a letter sent via facsimile and first class mail on October 28, 2002, and concluded the letter by stressing:

> Although the company considered forgiving the amount due in an effort to settle the matter, the parties have been unable to reach settlement.  Therefore, I am writing to clarify that GlaxoSmithKline requests repayment of the $8,850.00 for which drafts were cashed as promptly as possible.

Def.'s Stmt. of Mat. Facts ¶ 70; Pl.'s Response to Def.'s Stmt. ¶ 70; Pl.'s Mot. for Summ. J., Ex. 21 (letter from Thomas S. Williamson, Jr. to Gregory L. Lattimer (Oct. 28, 2002)).

Plaintiff makes three arguments in opposition to summary judgment on GSK's Counterclaim for unlawful conversion.  *See* Pl.'s Opp'n at 4-5.  First, Plaintiff contends that GSK is the reason Plaintiff has not been able to provide supporting documentation for the $8,850 in advances, as GSK expense reports are normally transmitted electronically and GSK required Plaintiff to return her company computer at the time of her termination on August 9, 2001.  *Id.* at 5.  Second, Plaintiff claims that GSK did not make a timely demand for the $8,850 because GSK's demand letter is dated the same day that the company filed its Counterclaim – October 28, 2002.  *Id.*  Third, Plaintiff asserts that there is no evidence that she used the $8,850 for non-business purposes, and she further argues that GSK will not be able to prove that she did so.  *Id.*  Each of Plaintiff's arguments is fundamentally without merit.

### 1.   Plaintiff's Claim that She Was Prevented from Submitting Supporting Documentation

Plaintiff first attempts to escape liability under GSK's Counterclaim for conversion by

23

asserting that "expenses reports were generated on her computer, her computer was confiscated

on the day she was terminated, because of that, she was unable to generate a final expense

report." Pl.'s Opp'n at 5. In addition to the fact that this argument implicitly concedes GSK's

claim that Plaintiff did not submit any supporting documentation for the $8,850 in question,

Plaintiff's argument fails for three reasons.

First, Plaintiff's central premise – that lack of access to a GSK computer precludes a

former sales representative from submitting supporting documentation for expenses – is

transparently faulty. Plaintiff has admitted that the normal procedure for a GSK sales

representative was that "expense reports were submitted electronically and supporting receipts

were mailed to GSK." Def.'s Stmt. of Mat. Facts ¶ 62; Pl.'s Response to Def.'s Stmt. ¶ 62. It is

undisputed that at no time, either in the weeks following her termination or any time since, has

Plaintiff mailed or otherwise provided – or even offered to provide – any receipts or other

documentation supporting specific expenses paid for with the $8,850 in cash advances. Def.'s

Stmt. of Mat. Facts ¶ 68; Pl.'s Response to Def.'s Stmt. ¶ 68. Indeed, given that Plaintiff

maintained a home office at her residence for the purposes of her employment with GSK, *see*

Pl.'s Opp'n to Def.'s Mot. to Dismiss at 2-3, the fact that Plaintiff was terminated by GSK would

not have affected her access to supporting receipts that could be mailed to GSK. Moreover, it is

undisputed that Plaintiff has never identified how the money was used, even without supporting

receipts, and Plaintiff has made no effort to direct GSK to third parties who might supply more

information or supporting documentation vis-á-vis the expenses in question.

Second, Plaintiff was certainly provided sufficient time by GSK to submit expense

reports concerning these drafts and any supporting documentation before her firing on August 9,

2001.  The bulk of the $8,850 in question ($7,850) was advanced to Plaintiff on May 31, 2001, and the remaining $1,000 was advanced to her on June 18, 2001.  Plaintiff has acknowledged that her GSK manager expected her to submit her expense reports within a week after each expense period.  *See* Def.'s Mot. for Summ. J., Ex. 6 ("Expectations for 2001") at 1 ("Expense reports to me by Wednesday after expense period – No exceptions."); *id.*, Ex. 5 (Poullard Dep.) at 139:1-16.  As such, Plaintiff certainly had sufficient time under normal GSK practice to submit her expense report for these drafts between late June and early August 2001.  Moreover, Plaintiff *actually* did electronically submit four expense reports to GSK to obtain reimbursement for business expenses that she incurred during the period from June 4-July 27, 2001.  *See id.*, Ex. 16 (Declaration of James J. Edwards (hereinafter, "Edwards Decl.")) at ¶¶ 11-20 & Attach. A-C. Those reports make reference to $1,000 of the drafts signed by Plaintiff on May 31, 2001 for which she provided supporting documentation; however, the reports make no reference to any of the drafts that constitute the $8,850 despite the fact that such a reference would be warranted given the circumstances and the opportunity provided.  *Id.*  Accordingly, Plaintiff certainly had the opportunity to submit expense reports and supporting documentation concerning the drafts in question while at GSK, but consciously chose only to deal with some drafts while ignoring the bulk of the expenditures.

Third, GSK provided Plaintiff another opportunity to submit supporting documentation during discovery in this case.  Importantly, GSK asked Plaintiff to produce substantiating documents in discovery, and Plaintiff produced no such documents.  For example, GSK specifically requested production of "all" receipts or other documents that would support any claim for business expenses that Plaintiff had incurred on behalf of GSK during her period of

employment.  *See* Def.'s Reply, Ex. 1 (Def.'s First Requests for Produc. of Docs.) at Nos. 18-19.

Plaintiff's response merely referred to "Attachment 4" of Plaintiff's document production, which

does not contain any documents that show Plaintiff used the drafts at issue for business purposes.

*Id.*, Ex. 1 (Pl.'s Responses to Def.'s First Requests for Produc. of Docs.) at Nos. 18-19; *see also*

*id.*, Attach. 4 (email correspondence between Plaintiff and GSK re: missing product samples and

Plaintiff's expenses incurred prior to March 9, 2001).  Indeed, Plaintiff failed to produce any

receipts indicating expenses during June, July, or the first week of August 2001, missing another

opportunity to point the Court or GSK to any documents to show how Plaintiff spent the $8,850

provided to her by GSK for business expenditures.

Given these three factors, the Court finds Plaintiff's claim that GSK somehow prevented

her from obtaining and/or submitting supporting documentation for the expenses in question to

be without foundation.

2.     <u>Plaintiff's Claim that Defendant's Demand Was Untimely</u>

Without citing to any legal authority, Plaintiff also argues that GSK's claim for

conversion must fail because its October 22, 2002 demand letter was "untimely," as it was sent to

Plaintiff's counsel on the same day that GSK filed its Counterclaim.  Pl.'s Opp'n at 5.  Plaintiff's

argument again fails for three reasons.

First, as a threshold matter, GSK was not required to serve a demand letter to substantiate

its conversion claim under District of Columbia law.  Rather, a demand letter "is necessary only

when there are no 'other facts and circumstances independently establishing conversion.'"

*Bowler v. Joyner*, 562 A.2d 1210, 1212-13 (D.C. 1989) (quoting *Shea*, 123 A.2d at 361).  Here, it

is undisputed that Plaintiff received $8,850 from GSK, but never properly accounted for the

funds pursuant to GSK policy.  Accordingly, GSK can establish conversion independent of any

demand letter, obviating the need for a demand letter under the law.  Second, Plaintiff has cited

no authority for her proposition that a demand letter must be sent prior to the filing of any claim

or counterclaim.  Third, and finally, Plaintiff can show no prejudice from any "delay" by GSK, as

she waited more than one year to file her Answer to Defendant's Counterclaim.  Plaintiff, by

waiting until November 3, 2003 to respond to Defendant's October 28, 2002 Counterclaim, had

over one year to moot Plaintiff's Counterclaim by repaying the amount or providing supporting

receipts before having to proceed with the instant litigation.  As such, Plaintiff's "timeliness"

defense must fail as a matter of law.[3]

> 3.  Plaintiff's Claim that No Evidence Suggests She Used the Funds for Non-
>     Business Purposes

Plaintiff's final "defense" to GSK's Counterclaim for unlawful conversion is her

contention that "[t]here is absolutely no evidence of record that plaintiff did not use the funds in

question for business-related expenses and there is no chance that GSK will ever be able to prove

that plaintiff did not so use the subject funds."  Pl.'s Opp'n at 5.  Plaintiff's only support for her

assertion is her own affidavit that states, "At no time did I ever use the funds provided to me by

---

[3] In Plaintiff's Answer to Defendant's Counterclaim, Plaintiff raises the defense of the
applicable statute of limitations, but does not specifically discuss this defense in her Opposition
to Defendant's Motion for Summary Judgment.  *See* Pl.'s Answer at 2.  To the extent that
Plaintiff's "timeliness" defense can be construed as an argument based upon the relevant statute
of limitations, Plaintiff's argument is without foundation.  Under District of Columbia law, a
three-year statute of limitations applies to claims for conversion.  *See Kuwait Airways Corp. v.
Am. Sec. Bank, N.A.*, 890 F.2d 456, 460-61 (D.C. Cir. 1990); *Forte v. Goldstein*, 461 A.2d 469,
472 (D.C. 1983) (per curium).  Defendant's Counterclaim arose, at the earliest, in May 2001, and
Defendant filed a Counterclaim regarding its claim for conversion on October 28, 2002, *see*
Def.'s Answer to Compl. and Counterclaim.  Accordingly, Defendant's Counterclaim is well
within the applicable statute of limitations.

GSK for anything other than GSK business related matters."  *See* Pl.'s Opp'n, Ex. 5 (Poullard

Decl.) at ¶ 9.  Plaintiff makes no effort to identify how the funds in question were spent, nor does

she identify any third parties that may be the source of any relevant information concerning the

expenses.  Plaintiff's conclusory affidavit, supported by no evidence within the record, is

insufficient to avoid summary judgment.  *See Johnson v. U.S. Capitol Police Bd.*, Civ. No. 03-

614 (HHK), 2005 WL 486743, at *2 (D.D.C. Mar. 2, 2005) (finding that an affidavit submitted

in opposition to a summary judgment motion did not meet the standard under Rule 56 because it

was "unsupported by any record evidence"); *Hastie v. Henderson*, 121 F. Supp. 2d 72, 81

(D.D.C. 2000), *aff'd sub. nom.*, *Hastie v. Potter*, Civ. No. 00-5423, 2001 WL 793715, at *1

(D.C. Cir. June 28, 2001) (no genuine issue of material fact where sole evidence plaintiff

provided was "her own self-serving and conclusory statement");  *Phillips v. Holladay Prop.*

*Serv., Inc.*, 937 F. Supp. 32, 35 n.2 (D.D.C. 1996), *aff'd*, 1997 WL 411695 (D.C. Cir. 1997)

("[A] plaintiff's denial . . . without producing substantiation for the denial is insufficient to

withstand a motion for summary judgment."); *Matthews v. Hesburgh*, 504 F. Supp. 108, 114 n.16

(D.D.C. 1980) ("Mere allegations even in an affidavit, unsupported by specific facts, are

insufficient to resist a motion for summary judgment."), *aff'd*, 672 F.2d 895 (D.C. Cir. 1981).

    Here, it is undisputed that Plaintiff was required by GSK policy to provide an accounting

for the business purposes of the cash advance at issue.  Plaintiff failed to do so, despite numerous

opportunities before her termination, after GSK's initial demand letter, after GSK's

Counterclaim, and after discovery in this case.  Plaintiff's expense reports do not account for the

cash advances during the relevant time period, and Plaintiff was required in written discovery to

produce the receipts showing the business purpose of the cash advances.  By failing to provide

any admissible evidence to support her defense that she "did not use the funds in question for business-related expenses," Pl.'s Opp'n at 5, Plaintiff's possession of the $8,850 is in violation of GSK policy and is therefore de facto unlawful.  Plaintiff has clearly "unlawful[ly] exercise[d] . . . ownership, dominion and control" over GSK property, in "denial or repudiation" of GSK's right to such property.  *Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 (D.C. 1976) (per curium).  GSK is entitled to summary judgment based on this proof regardless of whether GSK can establish the precise non-business purposes for which Plaintiff expended the $8,850.  Accordingly, finding no remaining issue of material fact, the Court shall grant GSK's Counterclaim against Plaintiff and award compensatory damages of $8,850, plus lost expenses and interest, to GSK.

  B.  *Count VI of Plaintiff's Complaint – Defamation*

  Given Plaintiff's explicit and implied concession of Counts II-V of her Complaint, only Count VI remains for the Court's consideration under Defendant's Motion for Summary Judgment.  While GSK contends that summary judgment in its favor is appropriate as to this count, because Plaintiff "has proffered not a shred of evidence to support her accusation that her former supervisors at GSK informed any former colleague or client of" Plaintiff's alleged "embezzlement," Def.'s Mot. for Summ. J. at 37, Plaintiff points to several pieces of "evidence" that allegedly support her claim for defamation.  *See* Pl.'s Opp'n at 6-7.  Specifically, Plaintiff cites as support (1) her deposition testimony, wherein she noted that "Drs. Gooray and Ashby contacted her and advised her of the allegations being made and she indicated that Dr. Ashby advised her that he had contacted Ms. Weatherly," *id.* at 6 (citing Plaintiff's deposition at 144-151); (2) the deposition of Sandra Weatherly, who confirmed that she received a call from Dr.

Ashby and discussed Plaintiff's termination, *id.* (citing Weatherly's deposition at 66); and (3) the

deposition of Alexia Knight, who testified that she heard from Nicole Cavanaugh, a therapeutic

specialist with GSK, that Plaintiff had stolen money from GSK, *id.* (citing Knight's deposition at

69-70).  In addition to this "evidence," Plaintiff contends that defamation can be inferred from

the fact that Plaintiff was aware of the alleged embezzlement by September 2001, more than a

year prior to GSK's Counterclaim and demand for repayment, meaning that Krebs or Weatherly

must have told her "friends, colleagues and business contacts about such a claim which was then

passed on to her."  *Id.* at 7.

  To establish a defamation claim in the District of Columbia, a plaintiff must prove the

following elements: "(1) that the defendant made a false and defamatory statement concerning

the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3)

that the defendant's fault in publishing the statement amounted to at least negligence; and (4) that

either the statement was actionable as a matter of law irrespective of special harm or its

publication caused the plaintiff special harm."  *Klayman v. Segal*, 783 A.2d 607, 613 n.4 (D.C.

2001); *Benic v. Reuters America, Inc.*, 357 F. Supp. 2d 216, 220-21 (D.D.C. 2004).  A statement

is defamatory "if it tends to injure [a] plaintiff in his trade, profession or community standing, or

lower him in the estimation of the community."  *Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d

142, 144 (D.C. Cir. 1969).  To qualify as defamation, a statement must cause the plaintiff to

appear "'odious, infamous, or ridiculous.'"  *Howard Univ. v. Best*, 484 A.2d 958, 989 (1984)

(quoting *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 697 (D.C. 1970)).

  Viewed through the prism of these legal requirements, it is plain that Plaintiff's

defamation must fail for three reasons.  First, it is well established that truth is an absolute

defense to a defamation claim. *Benic*, 357 F. Supp. 2d at 221 (citing *Olinger*, 409 F.2d at 144).

This defense may be established by demonstrating that the statements in question are

"substantially true." *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 29 (D.D.C. 2002). "Substantially

true" means that "the gist" of the statement is true or that the statement is substantially true, as it

would be understood by its intended audience. *Benic*, 357 F. Supp. 2d at 221 (citing *Moss v.*

*Stockard*, 580 A.2d 1011, 1023 (D.C. 1990)). Here, the undisputed facts show – and the Court

has concluded, *see supra* Section III(A) – that Plaintiff cashed $8,850 in GSK draft advances, but

failed to provide any supporting documentation that those monies were used for GSK business-

related purposes, as required by GSK policy. Accordingly, even if Krebs or Weatherly informed

Plaintiff's colleagues or clients that she "embezzled" GSK funds, such a statement would be

"substantially true" and GSK could not be held liable for defamation.

Second, even assuming *arguendo* that GSK somehow made false or defamatory

statements concerning Plaintiff, Plaintiff can offer no direct evidence that such defamatory

statements harmed her reputation or caused her personal harm. Rather, it is uncontested that

Plaintiff was hired as a pharmaceutical sales representative with Sanofi within a few short weeks

of her termination from GSK on August 9, 2001. This position has provided Plaintiff a higher

base salary, and Plaintiff has been a "top performer" at her new employer from the outset,

benefitting from promotion and bonus opportunities while working for her new employer.

Plaintiff has simply produced no evidence showing that she was injured either professionally or

personally from any such statements stemming from GSK. Moreover, Plaintiff has presented no

evidence supporting her contention that such statements somehow caused her mental anguish.

Rather, while Plaintiff has received psychological counseling, such counseling occurred over two

years after her termination, and the records of her counselor – Ms. Walker-Harris – reveal that

the counseling sessions never addressed her termination from GSK.  Def.'s Stmt. of Mat. Facts

¶¶ 78-80; Pl.'s Response to Def.'s Stmt. ¶¶ 78-80.  Accordingly, even if Plaintiff could prove that

defamatory statements were made by GSK, Plaintiff cannot establish the "harm" necessary to

substantiate a cause-of-action for defamation.

Third, and finally, GSK is correct that Plaintiff has produced no admissible evidence to

support her allegation that Krebs and/or Weatherly made defamatory statements to her colleagues

or former clients concerning any alleged "embezzlement" on her part.  As related in her

deposition, Plaintiff claims that three of her former sales-representative colleagues at GSK –

Michael McGhee, Stacy Taylor, and Alexia Knight – informed her that Krebs and Weatherly

stated to two of Plaintiff's former GSK customers – Drs. Ashby and Gooray – that she had been

terminated for embezzling $8,000 from GSK.  *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard

Dep.) at 144:11-18, 145:8-17, 146:19-25.  Here, Plaintiff purports to rely on double hearsay.

Specifically, her contentions stem from what she alleges her coworkers say that they claim to

have heard managers, Brian Krebs and Sandra Weatherly, say to Drs. Ashby and Gooray.  In

advancing these claims, Plaintiff does not point to any sworn declaration or any deposition

testimony by Mr. McGhee, Ms. Taylor, or Ms. Knight that supports Plaintiff's contention that

Krebs and Weatherly made defamatory statements about her to Drs. Ashby and Gooray.

To the extent the information relied upon by Plaintiff is based on second or third-hand

statements, rather than personal knowledge, the Court notes that such testimony consists of

inadmissible hearsay.  *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made

by the declarant while testifying at the . . . proceeding, offered in evidence to prove the truth of

the matter asserted."); Fed. R. Evid. 802 ("Hearsay is not admissible.").  Because "[o]nly that

portion of a deposition that would be admissible in evidence at trial may be introduced on a

summary judgment motion," any hearsay statements relied upon by Plaintiff are legally

insufficient to support her defamation claim.  10A Charles a. Wright, Arthur R. Miller & Mary

Kay Kane, Federal Practice and Procedure § 2722, at 371-72 (3d ed. 1998); *see also Gleklen v.

Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (hearsay

evidence is insufficient to defeat summary judgment, as "[v]erdicts cannot rest on inadmissible

evidence."); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir.

1998) ("An affidavit like this, consisting entirely of inadmissible hearsay, is not sufficient to

defeat summary judgment.").

  Moreover, Plaintiff's Opposition glosses over the fact that both Dr. Ashby and Dr.

Gooray signed declarations stating under oath that they "had not been informed by any GSK

manager or employee of the specific reasons for [Plaintiff's] departure from GSK," and –

similarly – they had "not been informed by any GSK manager or employee that [Plaintiff], while

she was employed by GSK, engaged in any financial impropriety."  *See* Def.'s Mot. for Summ.

J., Ex. 28 (Ashby Decl.) ¶¶ 5-6; *id.*, Ex. 29 (Gooray Decl.) ¶¶ 5-6.  Plaintiff's GSK supervisors,

Ms. Weatherly and Mr. Krebs, also denied in sworn testimony that they made defamatory

statements to Dr. Ashby or Dr. Gooray.  Def.'s Stmt. of Mat. Facts ¶ 82; Pl.'s Response to Def.'s

Stmt. ¶ 82.  Moreover, while Ms. Knight, in her deposition, stated that she heard another GSK

employee, Nicole Cavanaugh, "mention[]" a rumor that Plaintiff had stolen money from GSK,

*see* Pl.'s Opp'n at 6 (citing Knight Dep. at 69-70), Ms. Cavanaugh signed a declaration stating

under oath that (1) no GSK manager, including Weatherly and Krebs, ever informed her of the

reasons for Plaintiff's departure from GSK, and (2) no GSK manager, including Weatherly and

Krebs, ever informed her Ms. Cavanaugh that Plaintiff had engaged in any financial impropriety.

*See* Def.'s Mot. for Summ. J., Ex. 30 (Cavanaugh Decl.) at ¶¶ 3-4.  As such, the evidence of

direct testimony by all relevant parties definitively rebuts Plaintiff's double hearsay-based

allegations of defamation.  Given Plaintiff's total reliance on indirect, inadmissible evidence and

the wealth of evidence supporting a finding that no defamatory statements were made by Krebs

and Weatherly, Plaintiff simply cannot establish defamation as a matter of law.  *See Szot v.*

*Allstate Ins. Co.*, 161 F. Supp. 2d 596, 608 (D. Md. 2001) ("Plaintiff's references to the 'rumor

mill' created by her former peers' sheer speculation as to the grounds for her termination, without

more, is insufficient to establish a claim of defamation against . . . the employer."; Plaintiff had

no evidence that her supervisor was responsible for the rumors).

Accordingly, given that truth is a defense, Plaintiff has failed to produce evidence

showing professional or reputational harm, and Plaintiff's counter-argument relies solely on

inadmissible hearsay, no issue of material facts remains before the Court on Count VI of

Plaintiff's Complaint.  Rather, Plaintiff is unable to make a showing of defamation as a matter of

law, and Defendant's Motion for Summary Judgment as to Count VI must therefore be granted.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary

Judgment, and shall award Defendant $8,850, plus expenses and post-judgment interest, as

compensatory damages for Plaintiff's unlawful conversion of GSK funds.  An Order

accompanies this Memorandum Opinion.


Date:   November 30, 2005


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge